## MISSOURI, K. & T. R. CO. v. SKINNER.

No. 7121—Opinion Filed Oct. 31, 1916.

(160 Pac. 875.)

**1. Carriers—Carriage of Live Stock—Negligence—Dipping Cattle.**

"Dipping" cattle by a railway company in compliance with quarantine regulations established by law is a part of the service required by the shipping contract, and the question of negligence in the performance of this service must be measured by the terms of that contract.

**2. Same—Actions for Injuries—Admissibility of Evidence.**

In an action for damages against a railway company for negligence in failing to water cattle before dipping them, in compliance with established quarantine regulations—although the plaintiff contends that the contract for dipping was an independent, oral contract—the exclusion of the shipping contract, when offered in evidence in support of the allegation of the answer setting up such contract as a defense to the action, is prejudicial error.

(Syllabus by Galbraith, C.)

Error from Superior Court, Muskogee County; H. C. Thurman, Judge.

Action by J. W. Skinner against the Missouri, Kansas & Texas Railway Company. Judgment for plaintiff, and defendant brings error. Reversed and remanded for new trial.

Clifford L. Jackson, W. R. Allen, and M. D. Green, for plaintiff in error.

Harve N. Langley and Guy F. Nelson, for defendant in error.

Opinion by GALBRAITH, C. The defendant in error sued the plaintiff in error for damages to a shipment of cattle, on account of its negligent failure to water the cattle before dipping them. It is charged in the petition that the plaintiff shipped six carloads of cattle from Camden, Ark., to Adair, Okla.; that since they came from south of the quarantine line, established by the federal and state authorities, it was necessary to have them disinfected by dipping in arsenic dip before delivery to the shipper; that one of the railway company's dipping vats was located at Chouteau, in Mays county, Okla., and that these cattle were dipped at that place; "that in consideration of the sum of 25 cents per head, which said sum plaintiff paid defendant, the said defendant undertook to and did disinfect said cattle, as aforesaid, by dipping them in a solution containing arsenic, which said undertaking or contract to disinfect was oral," and further alleged "that on account of the failure of the defendant to water said cattle, and its failure and refusal to furnish plaintiff and plaintiff's caretaker with any facilities for watering said cattle, the said cattle were weakened and rendered extremely thirsty, and drank large quantities of the dipping solution aforesaid while they were being dipped by said defendant, as aforesaid, and were thereby made sick and injured." It is charged that 35 head of the cattle died from the effects of drinking this disinfectant, and that the company is liable for their value. The facts, in brief, are that J. W. Skinner is a resident of Mays county, living near Adair, and is engaged in farming and stock raising; that in the spring of 1913 he purchased some Arkansas cattle, brought them over to his place in Oklahoma for the purpose of feeding them; the cattle were shipped from Camden, Ark., to Adair, Okla. The Missouri, Kansas & Texas Railway Company received the shipment at Wagoner, on the morning of April 21, 1913, and about 1 o'clock of that day moved the cattle forward to Chouteau, where they were unloaded and disinfected in a dipping vat at that place. They were not, however dipped until the following day, April 22d. Late in the afternoon of that day they were reloaded in the cars and forwarded to

Adair, and were delivered to the shipper. Some of these cattle were dead in the cars when they were unloaded at Chouteau. Nothing is claimed, however, for these, but after they were dipped 2 or 3 died in the pens at Chouteau, and 2 or 3 in the cars while being transported to Adair, and some 30 head died a week or 10 days after they were delivered at Adair. In the process of dipping the animals pass from the dipping vat to a platform or draining pen, where they are required to remain 10 or 15 minutes to allow the fluid to drip from their bodies, and this platform was so arranged that the fluid was supposed to drain back into the dipping vat. It is claimed that the drains in the draining pen were permitted to fill up so that the fluid did not run back into the vat as was intended, but that large quantities of it stood in pools in this pen, from which the cattle being very thirsty, drank and were thereby poisoned, and that if they had not been thirsty they would not have drank of the fluid, and, of course, would not have been poisoned; that the failure to water the cattle before dipping them was negligence, and the proximate cause of the damage sustained.

It is contended by the railway company that dipping these cattle was a service covered by the shipping contract, and that its duties and liabilities in connection with such service must be measured by the terms of that contract; that under this contract it was not its duty to water the cattle, but the shipper undertook to care for and water the cattle in consideration of a reduced freight rate conceded in said contract, and therefore it was not liable for failure to perform a duty which the shipper had undertaken and agreed to perform himself. On the other hand, the shipper contends that the shipping contract was merely a contract for the transportation of the cattle, and that he claims nothing on account of that contract, but that he made a separate and independent, oral contract with the agent of the railway company for the dipping of these cattle, and that it was this oral contract that was negligently performed, which gave rise to his injury, and on account of which this action was brought. The only evidence in the record as to the oral contract is found in the testimony of the shipper, and is as follows:

"Q. Did you have any facilities of your own for dipping or disinfecting these cattle? A. No, sir. Q. Did you make any arrangements with anybody for doing that? A. Not until after they got up there. Q. Who did you make it with? A. Mr. Horn got on the train— Q. Who is he, A. He was working for the railway company, stock loading and unloading, and I suppose he did the dipping;

he said that that was his business. Q. Did you make any arrangements with him about the dipping? A. Yes, sir; I asked what he would charge. He said 25 cents a head, I said, 'Isn't that pretty steep?' He says, 'No, we charge you 25 cents a head.' He says, 'Do you know they have to be dipped?' I said, 'Yes.' Q. What did you do; did you pay it? A. Yes, sir, couldn't help myself. Q. Did you pay it? A. Yes, sir."

It will be observed that there was nothing in this contract in reference to watering the cattle before dipping them, and it does not seem that any duty of the railway company to water the cattle before dipping them would arise under this oral contract, especially since the quarantine regulations controlling the dipping of cattle did not require that the cattle should be watered before being dipped.

This court seems to be committed to the doctrine that it is the duty of the railway company, where the quarantine regulations require it, to furnish facilities for dipping cattle before delivering them to the consignee in compliance with the quarantine regulations, and that this service is a part of the public service called for and covered by the shipping contract. Midland Valley R. Co. v. State et al., 35 Okla. 672, 130 Pac. 803; and Midland Valley R. Co. v. Ezell, 36 Okla. 517, 129 Pac. 734.

It appears that the plaintiff in error had a tariff of charges, for dipping cattle, filed with the Interstate Commerce Commission, and also with the Corporation Commission of Oklahoma, and that the charge for this service set out in this tariff was the same as that claimed to have been made in the oral contract. The trial court took the view of the plaintiff below that the contract for the dipping was an independent, oral contract, and not covered by the shipping contract, and therefore excluded the shipping contract when offered in evidence. This ruling is assigned as error.

It does not seem to be important to a decision in this case to determine whether or not an independent oral contract for dipping the cattle was entered into. The negligence for which damages were claimed arose before the completion of the contract of carriage, and while the company was acting as a common carrier. The duty to water, if it existed, arose before the cattle were required to be dipped, and was no part of that service. The origin of this duty was prior in time to the commencement of the alleged oral contract, and was an obligation arising, if at all, under the shipping contract. The "dipping" being required by law before the cattle were

delivered to the shipper, and this being a service required of the railway company under its shipping contract, and this contract having been excluded when offered in evidence, in support of the allegations of the answer denying liability, the court and jury were without the only proper evidence for determining the duties and liabilities of the railway company, and therefore could not properly determine the same.

On account of the error in excluding the shipping contract, the judgment is reversed, and the cause remanded for a new trial.

By the Court: It is so ordered.